In the Matter of the APPLICATION OF THE COUNTY COLLECTOR OF THE COUNTY OF WINNEBAGO, ILLINOIS, FOR JUDGMENT AND ORDER OF SALE FOR TAXES ON LANDS AND LOTS UPON WHICH THE GENERAL TAXES AND/OR SPECIAL ASSESSMENTS FOR THE YEAR[S] 1991, 1992 AND 1993 ARE DELINQUENT; and for Judgment Fixing the Correct Amount of any Tax Paid Under Protest.

Nos. 92 C 20331, 93 C 20310 and 94 C 50357.

United States District Court, N.D. Illinois, Western Division.

Feb. 26, 1996.

Michael F. O'Brien, McGreevy, Johnson & Williams, Rockford, IL, for Plaintiff in Nos. 92 C 20331, 93 C 20310 and Defendant in No. 93 C 50357.

Anthony G. Scariano, Scariano, Kula, Ellch & Himes, Chicago Heights, IL, for Defendant in No. 92 C 20331.

Lawrence J. Weiner, Jonathan A. Pearl, Scariano, Kula, Ellch & Himes, Chicago, IL, for Defendant in No. 93 C 20310.

Lawrence J. Weiner, Scariano, Kula, Ellch & Himes, Chicago, IL, for Plaintiff in No. 93 C 50357.

## MEMORANDUM OPINION AND ORDER

REINHARD, District Judge.

### INTRODUCTION

In these three actions, consolidated for purposes of the pending motions, the tax objectors seek to challenge the authority of the Rockford Board of Education, School District No. 205 (school district), pursuant to an interim consent order entered by United States District Judge Stanley J. Roszkowski in the separate People Who Care desegrega-

tion lawsuit, No. 89 C 20168 (PWC case), to levy taxes via section 9–107 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act), 745 ILCS 10/9–107, to pay for the cost of remedying alleged racially discriminatory practices within the school district. While a district court judge does not ordinarily review findings of another district court judge in a separate case, the United States Court of Appeals for the Seventh Circuit has stated in its opinion affirming the denial of the objectors' petition to intervene in the PWC case that the ordinary rules of res judicata and collateral estoppel prohibiting such review do not apply in this case, *see People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 177–79 (7th Cir.1995), and the school district has so conceded by an express waiver in its brief.[1] Both the objectors and the school district have moved for summary judgment in this case. While several procedural issues have been raised by the school district concerning the manner in which the tax objections have been presented, the focus of the respective summary judgment motions addresses the ultimately dispositive issue of whether section 9–107 of the Tort Immunity Act authorizes the school district to levy taxes to pay for remedies necessitated by the Federal constitutional tort of racial discrimination in education, the nature of which requires the expenditure of money to effect necessary mandatory injunctive relief.[2] The court finds that in this particular case of racial discrimination, and the nature of the remedies involved, section 9–107 authorizes such a levy and, therefore, grants the summary judgment motions of the school district and de-

nies the summary judgment motions of the objectors.

## FACTS

The court need not provide an extensive factual discussion of the history of the underlying school desegregation case that eventually gave rise to the present tax objection litigation. Suffice it to say that since 1989, the school district has been involved in the PWC lawsuit in which it is alleged that the school district has engaged in racially discriminatory conduct in providing education to the students of the district. As part of that lawsuit, pending a hearing on liability, several orders were issued, including the second interim order entered by Judge Roszkowski on April 25, 1991. The second interim order contained, among other things, a consent order between the school district and the People Who Care plaintiffs finding that the school district "may pay for such recurring and continued incremental costs for such programs specified in this Order by additional levies in the [school district's] Tort Immunity Fund." The consent order further states that the school district "is mandated to fund the cost of the activities required" therein. Additionally, the consent order found that the funding of such remedies:

> constitutes and is the payment by the District of a liability, tort judgment or settlement that authorizes the issuance of the District's non-referendum general obligation bonds referred to in Section 9–105 of the Tort Immunity Act or the levying of an annual rate of tax in the District's annual levy for Tort Immunity purposes, to pay for the annual and recurring costs (other than the institution of capital im-

1. It must be noted that Judge Roszkowski has never ordered the school district to raise funds under the Tort Immunity Act. Rather, Judge Roszkowski, as part of a consent order, found that the school district had the authority under section 9–107 to do so. That finding, which was never contested or litigated, *see People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 178 (7th Cir.1995), is what is challenged by the objectors here.

2. The school district has alternatively argued, should this court hold the Tort Immunity Act does not authorize the school district to levy taxes here, that, pursuant to *Missouri v. Jenkins*, 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31

(1990), a federal court may authorize or require local officials to levy property taxes at a rate adequate to fund the desegregation remedy and enjoin the operation of state laws that limit such tax levies. While *Missouri v. Jenkins* (which a lower federal court must follow despite the objectors' contention that with new members on the Supreme Court it might change its opinion) authorizes a method to fund a remedy for discrimination in a public school system by property tax levy, this was not the basis of Judge Roszkowski's finding and is, therefore, not a proper consideration in the context of this court's review of these tax objection cases.

provements) as required by this Order. *Second Interim Order,* § F.2 p. 78 (PWC DKt. 376).

Based on the consent order and other orders of the court related to the second interim order, the school district issued bonds and levied taxes for 1991, 1992 and 1993 under provisions of the Tort Immunity Act. These tax levies were, in turn, challenged by the various tax objectors for each tax year in state court, and the cases subsequently were removed to federal court.[3] The objectors moved to remand all three cases to state court. This court, in an order dated April 21, 1995, denied the motions to remand in all three cases, finding the state court actions were an attempt by the objectors to interfere with an order of the federal district court and because, under the All Writs Act, 28 U.S.C. § 1651(a), this court has the power to retain jurisdiction over the state cases as necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued. While these cases were pending, Judge Roszkowski ultimately entered a final order of declaratory judgment and permanent injunction in the PWC case on March 29, 1994, finding the school district had unlawfully segregated students on the basis of race and ethnic origin and ordering the school district to eliminate all vestiges of segregation and discrimination against minority students.

There are several provisions of the Tort Immunity Act implicated by the challenge of the objectors in these cases. The first is section 9–107, which states, in pertinent part:

§ 9–107. A local public entity may levy or have levied on its behalf taxes annually upon all taxable property within its territory at a rate that will produce a sum which will be sufficient to pay the cost of settlements or judgments under Section 9–102, to pay the costs of protecting itself or its employees against liability, property dam-

age or loss, including all costs and reserves of being a member of an insurance pool, under Section 9–103, to pay the costs of and principal and interest on bonds issued under Section 9–105, to pay tort judgments or settlements under Section 9–104 to the extent necessary to discharge such obligations, to discharge any and all obligations under Section 34–18.1 of The School Code, as now or hereafter amended, and to pay the cost of risk care management programs.[4]

Section 9–102, in turn, provides, in pertinent part:

§ 9–102. A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article.

The term "tort judgment" is defined in section 9–101(d) as "a final judgment founded on an injury, as defined by this act ..." The term "injury" is defined in section 1–204 as:

§ 1–204. "Injury" means death, injury to a person, or damage to or loss of property. It includes any other injury that a person may suffer to his person, reputation, character or estate which does not result from circumstances in which a privilege is otherwise conferred by law and which is of such a nature that it would be actionable if inflicted by a private person. "Injury" includes any injury alleged in a civil action, whether based upon the Constitution of the United States or the Constitution of the State of Illinois, and the statutes or common law of Illinois or of the United States.

## CONTENTIONS

The objectors contend that the school district's levying of taxes pursuant to section 9–

---

3. The school district issued a tax levy for 1994 which was also challenged by over 13,000 tax objectors in state court and later removed to this court. *See* No. 95 C 50313 (95 TX 182). Similarly, tax objectors residing in Boone County, Illinois also challenged the 1994 tax levy in the circuit court of Boone County, which case was also removed to this court. *See* No. 95 C 50338 (95 TX 32). While both of these cases raise essentially the same issues as presented in the

three cases implicated by the present motions for summary judgment, by agreement of the parties neither has been briefed nor consolidated with the three cases. Nevertheless, their ultimate disposition likely will be controlled by the decision in the present case.

4. Section 17–2.5 of the Illinois School Code contains parallel language. 105 ILCS 5/17–2.5.

107 is unauthorized for the following reasons: (1) the express language of the Tort Immunity Act limits such tax levies to pay for compensatory damages only; (2) the Tort Immunity Act was not intended to be used as a general taxing power to finance ongoing programs of government spending; (3) the Tort Immunity Act has "utterly nothing to do with equitable remedies;" (4) the Tort Immunity Act has no applicability to the PWC case because that case makes no claim for damages; (5) the Tort Immunity Act uses the terms "pay" or "payment" throughout which relate to damages rather than other types of relief; (6) the expansive interpretation of the Tort Immunity Act urged by the school district would increase tax levy powers beyond any objective and definable limits; (7) the language in section 9–103 which provides for levying of taxes for risk management, self-insurance and related matters cannot be interpreted so broadly as to allow local governmental entities to levy taxes simply to protect themselves from future liability; and (8) the Tort Immunity Act should not be construed to sanction a radical transfer of the taxing power to the federal courts.[5]

The school district responds that the Tort Immunity Act authorizes the tax levies to fund the remedies in the PWC case. Specifically, the school district argues that the broad language of the Tort Immunity Act and the legislative history behind section 9–102 demonstrate no intent by the legislature to draw a distinction between judgments for damages generally and judgments for equitable relief that require the expenditure of money to compensate for damages incurred by a violation of constitutional rights. Further, the school district contends that the relief provided in school desegregation cases is, by its nature, compensatory and, therefore, falls within the terms of the Tort Immunity Act regarding tax levies. Additionally, the school district asserts, relying primarily on *Outboard Marine Corp. v. Liberty Mut.*

*Ins.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992), that the term "damages" in the Tort Immunity Act, when given its common, ordinary meaning, includes the type of relief available in the PWC case.[6]

**DISCUSSION**

Because this matter is before the court on the parties' respective cross-motions for summary judgment, the court must only grant summary judgment if the record shows that there is no genuine issue of material fact and that one of the parties is entitled to judgment as a matter of law. *See Thiele v. Norfolk & Western Ry. Co.*, 68 F.3d 179, 181 (7th Cir.1995). The parties do not identify any genuine issues of material fact, and the court finds none in the record. Thus, the motions for summary judgment present purely a legal question as to whether the school district is authorized to levy taxes under the Tort Immunity Act to pay for the costs of remedies required by the orders entered in the PWC case. In addressing this issue, the court notes that at the time the tax levies in these three cases were imposed, no judgment of liability had yet been imposed. Nonetheless, there had been a settlement, as embraced by the second interim order, which was sufficient to trigger the provisions of section 9–107. *See* 745 ILCS 10/9–107 (section 9–107 applies to "settlements or judgments under Section 9–102").

An analysis of this issue under Illinois law, which requires the court to ascertain and effectuate the intent of the Illinois legislature, *Bubb v. Springfield Sch. Dist. 186*, 167 Ill.2d 372, 212 Ill.Dec. 542, 547, 657 N.E.2d 887, 892 (1995), necessarily begins with the express language of the Tort Immunity Act itself. The most basic rule in this regard is that the plain language of the statute is the best indicator of the legislature's intent. *Bubb*, 212 Ill.Dec. at 547, 657 N.E.2d

---

**5.** While the lawsuits challenge the school district's authority to levy taxes under these circumstances, the amount of the levies and the appropriate allocation of such funds are not issues in these suits.

**6.** People Who Care plaintiffs, having previously been denied leave to intervene by this court,

subsequently filed a motion for leave to file a brief as amicus curiae on the side of the school district. As the parties to this litigation have ably and comprehensively presented the issues, there is no need for further briefing, and the motion is denied.

at 892. The court must look to several provisions of the Tort Immunity Act to divine the legislative intent.[7]

■ The school district argues that the Tort Immunity Act encompasses the action brought in the PWC case, pointing to the definition of "tort judgment" in section 9–101, which means a final judgment founded on an "injury." The term "injury", in turn, is defined in section 1–204 as including "any injury alleged in a civil action, whether based upon the Constitution of the United States or ... the statutes or common law ... of the United States."

The court does not agree with the school district that this language alone reflects an intent on the part of the legislature for an expansive interpretation of the Tort Immunity Act in the manner it asserts. While it does make it clear that the Tort Immunity Act embraces federal constitutional or common law causes of action, it does not, by its terms, speak to the nature of such causes of action or the type of relief or remedy sought therein.

■ The court is persuaded, however, by the school district's argument that the term "damages" should be given its plain and ordinary meaning, which includes any monies one must expend to remedy an injury for which the governmental entity is responsible, including those expenditures that come as part of compliance with a mandatory injunc-

tion. It is a basic tenet of statutory construction under Illinois law that the language of a statute should be given its plain and ordinary meaning. *Coldwell Banker Residential Real Estate Serv. of Illinois, Inc. v. Clayton*, 105 Ill.2d 389, 86 Ill.Dec. 322, 325, 475 N.E.2d 536, 539 (1985). In giving the term "damages" its plain and ordinary meaning in the context of a comprehensive general liability insurance policy, the Illinois Supreme Court looked to the dictionary definition of "damages." *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 703, 607 N.E.2d 1204, 1216 (1992) (citing Webster's Third New International Dictionary 571 (1985)). That source defines "damages" as "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." *See id.* at 703, 607 N.E.2d at 1216. The Illinois Supreme Court held that this popular definition does not distinguish between legal compensatory damages and the costs of complying with a mandatory injunction. *Id.*

■ As noted above, the language of a statute should be given its plain and ordinary meaning. The addition of the term "compensatory" in the language of section 9–102, by itself, does not, for several reasons, detract from the plain and ordinary meaning of damages recognized by the Illinois Supreme Court in *Outboard Marine*.[8] First, the dic-

7. While the Tort Immunity Act is not a traditional taxing statute, it is sufficiently similar to arguably justify application of the statutory construction rule that taxing statutes are to be strictly construed, and that in cases of doubt they are construed most strongly against the government and in favor of the taxpayer. *See Van's Material Co., Inc. v. Department of Revenue*, 131 Ill.2d 196, 137 Ill.Dec. 42, 45, 545 N.E.2d 695, 698 (1989). Nonetheless, the court's ultimate task is to ascertain the legislative intent.

8. While the objectors rely on *Romano v. Village of Glenview*, 277 Ill.App.3d 406, 213 Ill.Dec. 799, 660 N.E.2d 56 (1st Dist.1995), as support for their contention that the term damages under section 9–102 is limited to purely compensatory, non-injunctive relief, the court finds that case does not support such a conclusion. In *Romano*, the defendant park district contended that it was immune under the Tort Immunity Act because the injunctive relief sought by the plaintiffs was a "form of damages" thereby bringing the case

"within the ambit of the [Tort Immunity Act]." *Id.*, at 59, 660 N.E.2d at 802. In rejecting that contention, the appellate court held that, although the injunction might require the expenditure of money by the defendants, injunctive relief does not constitute damages under the Tort Immunity Act. *Id.*, at 60, 660 N.E.2d at 803.

The *Romano* case only establishes that the immunity under the Tort Immunity Act is unavailable to a defendant against which a plaintiff seeks to obtain injunctive relief. That being the case, the local governmental entity is subject to liability notwithstanding the Tort Immunity Act. As such, the provisions of section 9–102 and, in turn, 9–107 would remain applicable provided the definition of damages is otherwise broad enough to encompass certain types of injunctive relief.

Nor is the court persuaded by the *Romano* court's distinguishing of *Outboard Marine*. The court recognizes that *Outboard Marine* defined

tionary definition relied on in that case also uses the term "compensation" in defining damages. Thus, the presence of the qualifier "compensation" in the dictionary definition considered in *Outboard Marine* did not alter the conclusion reached by the Illinois Supreme Court in that case.

Second, the relevant legislative history pertaining to the Act indicates that the qualifying language was placed in that provision not to distinguish between legal compensatory damages and the costs of complying with a mandatory injunction, but rather, to differentiate between compensatory damages, which are designed to make whole, and punitive damages, which are designed to punish, the latter generally not being permissible in Illinois against a local public entity. While there is no definitive discussion of the purpose of the qualifier "compensatory" in the legislative debates, Representative Greiman assured Representative O'Connell that the amendment did nothing to change a local governmental entity's ability to raise money for payment of a tort judgment. *See* Illinois House of Representatives, 84th General Assembly, Transcription Debates 16 (June 30, 1986). Such comment is more consistent with the court's interpretation of the use of "compensatory" to qualify damages than the objectors' view that the insertion of the term "compensatory" in only that one part of the statute had broader implications.[9]

This interpretation is further reinforced by other amendments and legislative comments thereon that were made as part of the same public act adding the qualifier "compensatory" in section 9–102. Section 2–102 was amended to prohibit punitive or exemplary damages against a local public entity indirectly, that is, in an action by an employee via indemnity. Representative Greiman explained in the House debate that the language pertaining to an indirect action was

being added to make a "public statement" that the legislature does not want local public entities paying punitive or exemplary damages via indemnity. *See* Illinois House of Representatives, 84th General Assembly, Transcription Debates 28 (June 30, 1986). Furthermore, section 2–302 of the Act was amended by the same public act to declare the public policy of the State that "no local public entity may elect to indemnify an employee for any portion of a judgment representing an award of punitive or exemplary damages." Again, Representative Greiman stated in the debate that the intent of the public policy statement was to prevent local governmental entities from directly or indirectly paying punitive damages. *See* Illinois House of Representatives, 84th General Assembly, Transcription Debates 81 (June 30, 1986).

While neither the amendments to section 2–102 or 2–302, nor the legislative comments thereon, directly address the significance of the word "compensatory" in section 9–102, they do suggest that the insertion of the term "compensatory" in section 9–102 was done to distinguish between compensatory and punitive damages. It is clear that, in passing the public act amending the Act, the legislature intended to prohibit local governmental entities from paying for the punitive damages liability of its employees. Because section 9–102, as it was worded prior to the 1986 amendment, arguably would have allowed a tax levy by a local governmental entity to pay for liability under a judgment or settlement for punitive as well as compensatory damages against its employees, the insertion of the word "compensatory" into section 9–102 was consistent with the intent of the legislature to prevent local entities from paying such claims. Accordingly, the court finds the inclusion of the term "compensatory" before damages in section 9–102

damages in an insurance coverage case in the environmental clean-up context. What makes *Outboard Marine* applicable to this case is its reliance on the plain and ordinary definition of damages, which is based on a rule of construction that is equally applicable in the statutory interpretation context. The distinctions, while apparent, are of no difference.

**9.** The court notes that Senator Syverson, on March 2, 1995, introduced Senate Bill 649 in the

Illinois 89th General Assembly which contained an express amendment to section 9–107 that the Act "does not authorize the levying of taxes to defray the cost of complying with equitable relief." Neither the introduction of, nor the failure to pass, the amendment provides conclusive evidence on whether the Act is limited to funding compensatory rather than equitable damages.

does not alter the popular dictionary definition of damages.

The court does not find the language of section 2–101 of the Tort Immunity Act to support a contrary conclusion. Section 2–101 provides, in part, that "[n]othing in [the Tort Immunity Act] affects the right to obtain relief other than damages against a local public entity or public employee." While this language suggests that the Tort Immunity Act does not apply to forms of relief other than damages, it does not add to, or detract from, the meaning of the term damages. It speaks merely to the scope of the Tort Immunity Act and not to the definition of damages.

■ The court also finds that the nature of the remedies sought in the PWC case are of the type contemplated by the term "damages" in the Tort Immunity Act. While the PWC case may be characterized generally as one of equity seeking mandatory injunctive relief, it is unique in the type of relief it seeks. The essence of the injury alleged in the PWC case is a denial of an education for minority students comparable to that afforded to white students in the district. The commensurate relief sought is an education comparable to that afforded to white students. What was lost was equal education, what is sought is equal education. The People Who Care plaintiffs do not seek purely some action on the part of the school district to prevent future injury, or in other words, the classic prospective relief associated with injunctive actions. Rather, much of what the People Who Care plaintiffs request in their lawsuit is compensation for past wrongs, and for this type of past wrong, direct money compensation to the class plaintiffs is not the appropriate remedy. For the school district's stock in trade is education. An equal educational opportunity was denied, and that is what ultimately must be provided through monies received by the tax levies.

This notion finds support in *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). While addressing a different issue, the United States Supreme Court discussed the nature of the relief

sought in a school desegregation lawsuit. *Id.* at 288–90, 97 S.Ct. at 2761–62. Although the Court concluded that the relief in these types of cases has sufficient characteristics of traditional equitable remedies to prevent application of Eleventh Amendment immunity against a state defendant, the Court also recognized the compensatory nature of such relief. In that regard, the Court stated that the fact that "the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system." *Id.* at 290, 97 S.Ct. at 2762. (Emphasis in original.)

The court here considers this language from *Milliken* to support its characterization of the relief sought in the PWC case. Clearly, the relief requested has components of both traditional injunctive and compensatory relief. It is the significant compensatory aspects of the remedies sought, however, that bring it within the ambit of the Tort Immunity Act's tax levying provisions.

Such a conclusion is further supported by the legislature's express inclusion of federal constitutional and common law torts within the definition of injury. As discussed above, this court does not regard the inclusion of such language alone as broadening the Tort Immunity Act's scope such that all purely equitable injunctive or prospective relief is embraced within its terms. Nevertheless, clear reference to federal constitutional torts, which torts by any definition encompass school discrimination, reflects an intent to have the Tort Immunity Act apply to such a lawsuit to the extent the relief sought has significant compensatory components, as it does here.

Because the ruling that the funding provisions of the Tort Immunity Act apply to the PWC school desegregation case is a narrow one, based on the unique remedies necessitated by the past discrimination, the concerns expressed by the objectors regarding an unduly expansive reading of the Tort Immunity Act in other cases are unfounded.[10]

---

10. In reaching its decision in this case, the court believes its interpretation of the Act is consistent with the rule of strict construction applied to taxing statutes. *See supra* note 7.

Of course, the Illinois General Assembly remains free to amend the Act to expressly prohibit the use of section 9–107 to fund the remedies arising out of a school desegregation lawsuit. The present wording of the Act, however, allows funding of the school desegregation remedies without unnecessary interference by the federal court. *See Missouri v. Jenkins,* 495 U.S. 33, 48–52, 110 S.Ct. 1651, 1661–64, 109 L.Ed.2d 31 (1990). In fact, under *Missouri v. Jenkins,* the Supreme Court recognized that there may be instances where funding of federal court-ordered remedies might be achieved via existing state law. *Id.* at 51–52, 110 S.Ct. at 1663–64. Doing so both protects the function of the local governmental institution and also places the responsibility for solutions to the problems of segregation upon those who have themselves created the problems. *Id.* at 51, 110 S.Ct. at 1663–64. Under this court's interpretation of the Act, the problems of financing desegregation are addressed via state legislation. *See id.* at 52, 110 S.Ct. at 1664. Unlike the circumstances in *Missouri v. Jenkins,* the legislation at issue here (the Act) does not curtail the power of a school district which is ready, willing and able itself to remedy the deprivation of constitutional rights. *See id.* at 51, 110 S.Ct. at 1663.

Having concluded that section 9–107 provides the necessary authority for the school district to levy taxes via section 9–102, the court need not reach the alternative argument that section 9–107 in conjunction with section 9–103 provides such authority. Such a position is doubtful, however, as the language of section 9–103 appears to be directed at insurance and self-insurance rather than creating a far-reaching license to raise money to pay for prophylactic methods of loss prevention.

The court also need not address the procedural questions raised by the school district related to the filing of the tax objections.

## CONCLUSION

For the foregoing reasons, the court denies the motions for summary judgment filed by the tax objectors, grants the motions for summary judgment of the school district and dismisses these three causes in their entirety.